## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| MELVIN RAY, | ) | |
| ROBERT EARL COUNCIL, | ) | |
| and | ) | |
| RICARDO "RAOUL" POOLE, | ) | |
| | ) | |
| **Plaintiffs** | ) | **Case No.:** |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| COMMISSIONER JOHN HAMM, | ) | |
| WARDEN PAMELA HARRIS, | ) | |
| ASSISTANT WARDEN THEODORE | ) | |
| WILLIAMS, | ) | |
| and | ) | |
| ASSISTANT WARDEN FITZGERALD | ) | |
| CLEMONS, | ) | |
| *in their individual and official* | ) | |
| *capacities,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiffs are three individuals incarcerated within the Alabama Department of Corrections. Plaintiffs are nonviolent advocates who seek to improve the conditions in Alabama's prisons, and they frequently collaborate with un-incarcerated advocates on common goals. With no warning or explanation and without having been charged with any rule violations, Plaintiffs were transferred to "L-Block" at Kilby Correctional Facility. Before their arrival, L-Block was retrofitted specifically for their confinement, and the conditions they are subjected to there are uniquely restrictive and isolating. Plaintiffs' transfer and restrictive confinement was for the sole purpose of intimidating Plaintiffs and the un-incarcerated individuals with whom they advocate into relinquishing their First Amendment rights to speech and association. To ensure that these important rights remain protected, Plaintiffs seek immediate injunctive relief and damages.

## JURISDICTION AND VENUE

1.      This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights under the First Amendment to the United States Constitution.

2.      This Court has subject-matter jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343(a).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in this district and because at least one defendant resides in this district and all defendants are residents of the State of Alabama.

## PARTIES

### *Plaintiffs*

4.      Plaintiff Melvin Ray is an activist currently incarcerated within the Alabama Department of Corrections ("ADOC" or "Department"). Plaintiff Ray is the founder of the Free Alabama Movement ("FAM"), an organization comprised of incarcerated and un-incarcerated individuals that advocates for the use of nonviolent action to protect the civil and human rights of incarcerated individuals and improve conditions within the ADOC.

5.      Plaintiff Robert Earl Council is an activist currently incarcerated within the ADOC. Plaintiff Council is a co-founder of FAM.

6.      Plaintiff Ricardo "Raoul" Poole is an activist currently incarcerated within the ADOC. For nearly a decade, Raoul has been speaking out about the inhumane conditions inside Alabama's prisons and working to combat some of their worst effects on incarcerated individuals. He has personally mentored hundreds of younger incarcerated men, and he has helped create, organize, and run treatment, rehabilitation, and mentorship programs in prisons across the state. He has helped plan and coordinate many of FAM's nonviolent actions protesting and attempting to change the conditions within the ADOC.

***Defendants***

7.    Defendant Commissioner John Hamm is the Commissioner of the ADOC, the state agency that administers the prison system in Alabama. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC; sets Department-level policies and customs; oversees and approves facility-level policies and customs; and plans, directs, controls, and otherwise manages all ADOC facilities. As Commissioner, Defendant Hamm is a final policymaker for the Department and acts under color of state law. He is sued in his official capacity for prospective injunctive relief and in his individual capacity for damages.

8.    Defendant Warden Pamela Harris is the Warden III, the head warden, of Kilby Correctional Facility, an ADOC prison in Montgomery County. As Warden III, Defendant Harris is responsible for the day-to-day operations of Kilby; the safety and security of all prisoners there; and the supervision, discipline, and training of all Kilby employees. She creates, reviews, revises, and approves all of Kilby's standard operating procedures ("SOPs"), post orders, and post plans; reviews and approves all proposed staffing and facility-management plans; and manages, monitors, and supervises all operations and personnel at Kilby. As Warden III, Defendant Harris is a final policymaker for Kilby and acts under color of state law. She is sued in her official capacity for prospective injunctive relief and in her individual capacity for damages.

9.    Defendant Assistant Warden Theodore Williams is the Warden II, an assistant warden, at Kilby. As Warden II, Defendant Williams is responsible for implementing and enforcing institutional policies and practices in a manner consistent with the Constitution of the United States and Alabama State law. As Warden II, Defendant Williams acts under color of state law. He is sued in his official capacity for prospective injunctive relief and in his individual capacity for damages.

10.    Defendant Assistant Warden Fitzgerald Clemons is the Warden I, an assistant warden, at Kilby. As Warden I, Defendant Clemons is responsible for implementing and enforcing institutional policies and practices in a manner consistent with the Constitution of the United States and Alabama State law. As Warden I, Defendant Clemons acts under color of state law. He is sued in his official capacity for prospective injunctive relief and in his individual capacity for damages.

## FACTS

11.    Plaintiffs are all longtime activists who personally use nonviolent advocacy to bring public awareness to the unconstitutional conditions inside Alabama's prisons in order to change those conditions for the better. Plaintiffs also associate and collaborate with un-incarcerated individuals and organizations who have the same goals and ideals.

12.    Plaintiffs each entered the custody of the ADOC for the first time at a young age and have been incarcerated for decades. Melvin Ray was only seventeen years old when he first went to prison, having been tried as an adult for crimes that occurred when he was sixteen. He is currently serving a sentence of life without the possibility of parole, a sentence made mandatory by the convictions he received as a teenager. He has now been incarcerated for nearly twenty-seven years. Robert Earl was only twenty years old when he was sentenced to life without the possibility of parole for his first felony conviction. He has now been incarcerated for nearly thirty-two years. Raoul was sixteen when he was first arrested. Just two years later, at eighteen years old, he was sentenced to life in prison. He has now been incarcerated for nearly thirty-three years.

### *The Inhumane Conditions Inside Alabama's Prisons*

13.    Conditions inside Alabama's prisons have historically been among the worst in the nation. The prisons are overcrowded, understaffed, and saturated with drugs. Inmate-on-inmate violence is common. It is the norm—not the exception—for prisoners to have weapons. Guards assault prisoners with impunity. These conditions have existed throughout the ADOC for years.

4

14.    In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by guards; and whether the prisons provide safe, sanitary, and secure living conditions.[1]

15.    In April 2019, the DOJ published the first of two reports of its investigation (the "April 2019 Report").[2] The April 2019 Report asserted that reasonable cause existed to believe that "Alabama routinely violates the constitutional rights of prisoners housed in [its] prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions," and that these violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."[3]

16.    In July 2020, the DOJ published a second report of its investigation, documenting its findings about the use of excessive force throughout the ADOC (the "July 2020 Report").[4] The DOJ reported that it found "reasonable cause to believe that the correctional officers within the [ADOC] frequently use excessive force on prisoners housed throughout Alabama's prisons for

---

[1] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[2] Press Release, U.S. Dep't of Justice, *Justice Department Alleges Conditions in Alabama Men's Prisons Violate the Constitution* (April 3, 2019), *available at* https://www.justice.gov/archives/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution; Letter from the U.S. Dep't of Justice, Notice Regarding Investigation of Alabama's State Prisons for Men (April 2, 2019), *available at* https://www.justice.gov/archives/opa/press-release/file/1150276/dl?inline= ("April 2019 Report").

[3] *Id.*

[4] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (July 23, 2020) ("July 2020 Report"), *available at* https://www.justice.gov/crt/case-document/file/1297031/dl.

men"; that the use of excessive force was "pervasive" and "pursuant to a pattern or practice"; and that "[t]he systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment."[5]

17.    After publishing the April 2019 Report, the DOJ attempted to reach an agreement with Alabama about how it would voluntarily remedy the unconstitutional conditions in its prisons. Those negotiations failed, the unconstitutional conditions in Alabama's prisons for men persisted, and Alabama's prisoners "continued daily to endure a high risk of death, physical violence, and sexual abuse at the hands of other prisoners."[6] Concluding that "constitutional compliance cannot be secured by voluntary means," the United States sued Alabama under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, *et seq.*, to protect the constitutional rights of Alabama's prisoners. That litigation is ongoing.

### *Plaintiffs' Nonviolent Organizing and Advocacy*

18.    As young men faced with the possibility of spending the rest of their lives in the prison system described above, Plaintiffs began advocating for the rights of Alabama's prisoners.

19.    Part of Melvin's and Robert Earl's advocacy involved founding FAM. Founded in 2013, FAM advocates for humane prison conditions, criminal-justice reform, and the end of the forced, unpaid, prisoner-labor on which the ADOC and prisons across the country profit. To further those goals, FAM "has chosen the Non-Violent and Peaceful Protest strategy of 'shutdowns'/work stoppages," with the aim of "combat[ting] the multi-billion dollar Prison Industrialized Complex."[7]

---

[5] *Id.* at 1, 7.

[6] *United States v. Alabama*, No. 2:20cv1971, Doc. 71, ¶¶ 3, 8 (N. D. Ala. Nov. 19, 2021).

[7] Free Alabama Movement, *F.A.M. Pamphlet: Who We Are* (undated), *available at* https://freealabamamovement.wordpress.com/f-a-m-pamphlet-who-we-are/.

20.    FAM does not advocate only for the rights of prisoners *themselves*; it seeks to end the harmful effects of incarceration that extend far beyond the prison walls. One of FAM's main articulated goals is "to [end] exploitive practices that penalized our families, like J-Pay, excessive phone call rates, high canteen and incentive prices, and medical co-pay services."[8]

21.    Similarly, FAM's advocacy strategy does not depend exclusively on the incarcerated population: FAM "call[s] on the Family, Friends, Loved Ones and supporters of those incarcerated[] to assist" in accomplishing its goals.[9] FAM's un-incarcerated supporters hold frequent meetings, rallies, protests, and press conferences; they attend legislative hearings and community meetings to represent FAM and show support for prisoners and criminal-justice reform; and they meet with their elected representatives to advocate for FAM's goals.

22.    Indeed, FAM frequently makes public statements acknowledging the integral role its un-incarcerated supporters play in its advocacy and mission.

   a.    A March 18, 2024 post on FAM's Facebook page states: "'Outside support for us starts at the prisons. That's where we need people. Come to one of these protests, show your face, and tell us that you support us. That's how we know that you support us. Outside support is the first step.' – The Free Alabama Movement"

   b.    Another post the same day states: "The Free Alabama Movement needs outside forces to assist with mobilization efforts. Outside protestors convey a message to police and the state that we are watching the shutdown, in solidarity with those incarcerated, and let our incarcerated comrades know that we stand with them, <u>boosting morale and encouraging them to follow FAM's line.</u>"

---

[8] *Id.*

[9] *Id.*

23.     Soon after its founding, FAM began to organize and execute successful collective action in prisons across Alabama.

24.     In January 2014, FAM led its first prison shutdown, which occurred at Holman Correctional Facility in Atmore, St. Clair Correctional Facility in Springville, and Elmore Correctional Facility in Elmore. The shutdown lasted twenty-one days.

25.     Three months later, in April 2014, FAM organized another shutdown, which occurred at Holman and St. Clair.

26.     In May 2016, five Alabama prisons participated in another FAM-organized shutdown, which lasted for ten days.

27.     On September 9, 2016, the 45th anniversary of the Attica prison uprising in New York, FAM organized a nationwide prison shutdown. It was the largest prison strike in the United States to date: nearly 40,000 prisoners in twenty-four different states participated.

28.     Six years later, in 2022, FAM organized another historic shutdown, this time focused solely on Alabama's prisons. The shutdown was the largest and longest shutdown of prisons in Alabama. It began on September 26, 2022, and ended twenty-three days later, on October 15, and prisoners at each of the ADOC's thirteen major facilities participated. In an effort to stop the shutdown, the ADOC began to punish all prisoners at every facility involved immediately after the shutdown began. It significantly restricted prisoners' access to food, reducing the number of meals served in the dining halls from three to two each day. It began to serve all meals cold, and prisoners reported that the "meals" served often consisted only of a single piece each of bread and cheese. It shut down the prison's commissary shops, preventing prisoners from supplementing the meals provided by the ADOC with food they purchased themselves. It put most facilities on 24-hour lockdowns, shutting inmates inside overcrowded dorms or tiny, cramped cells nearly all day.

It let trash pile up, leaving it inside the dorms and overflowing onto walkways and recreation areas. It ceased laundry services. It cancelled visitation.

29.    Plaintiffs' activism and efforts to protect the civil and human rights of prisoners in Alabama has not been limited to organizing shutdowns. Over the years, all three plaintiffs have been vocal critics of the conditions inside Alabama's prisons. Plaintiffs have spoken with members of the media and shared pictures and videos of the reality of life inside an Alabama prison. They have advocated for other incarcerated individuals who were subjected to excessive force, retaliation, or other constitutional violations at the hands of ADOC employees. They have filed civil lawsuits against the ADOC and its employees for civil-rights violations. And they have consistently spoken out—to other prisoners, to prison administrators, and to the public at large— about the hellish conditions Alabama prisoners experience every day.

30.    On January 28, 2025, "The Alabama Solution," a feature-length documentary about the ADOC, premiered at the Sundance Film Festival in Utah. The Alabama Solution depicts—for the first time and using the unique storytelling power of a movie—the shocking and inhumane conditions inside Alabama's prisons. The film captures prisoners' squalid living conditions, including the reality that hundreds of prisoners are "homeless" and forced to sleep on benches, the floor, or hallways because ADOC employees do not ensure they have access to their assigned rack or cell. It chronicles the unrelenting and extreme levels of inmate-on-inmate violence, showing prisoners soaked in blood, hallways covered with blood splatters, and a never-ending parade of ambulances and medical helicopters to and from the prisons. It illustrates the prisons' inundation with drugs and the devastating effect drugs have had inside the prisons, showing prisoners passed out on beds, the floor, toilets, hallways, and in the middle of rooms. It highlights the viciousness, brutality, and apparent sadism of some ADOC officers, telling the story of Steven Davis, a young prisoner who was assaulted by multiple officers and eventually beaten to death by then-Sergeant

Roderick Gadson. It recounts the millions of dollars of profit Alabama and the ADOC make by relying on the free and involuntary labor of its prisoners. And it provides an inside look at the organizing and coordination associated with the FAM-led 2022 shutdown.

31.     The movie received immediate and widespread praise and was nominated for and won numerous awards. On October 10, 2025, it was released to the public and made available to stream on HBO and Max.

32.     On January 22, 2026, it was nominated for the 2026 Academy Award for Best Documentary Feature.

33.     Alabama Governor Kay Ivey's communication director responded to the nomination in an official statement, quipping that "the Oscars ha[ve] a low bar," and asserting that Ivey is "getting the job done" and addressing the problems within the ADOC.

34.     A substantial portion of the video footage in The Alabama Solution is comprised of cell phone interviews with Plaintiffs, as well as video footage they and other unnamed sources collected from within the prison.

35.     Cell phones are considered "contraband" by the ADOC because they can be used to conduct and coordinate illegal and exploitative activity, like smuggling drugs and weapons into the prisons and extorting other prisoners' family members.

36.     However, cell phones have also been the main—and almost the *only*—way the public has received accurate information about the conditions and circumstances inside Alabama's prisons.

37.     The ADOC is remarkably opaque about the conditions inside its prisons. It refuses to allow members of the media access to its prisons, except in limited and highly controlled circumstances. Several hand-selected religious and charitable organizations are allowed inside the prisons to provide spiritual and rehabilitative programming to prisoners, but those organizations'

access is subject to numerous conditions and near-arbitrary revocation. Attorneys' access to the prisons—including their access their own clients—is regulated, circumscribed, and subject to delay, denial, or revocation without any notice or reason. Without a court order, no attorney who is not associated with the ADOC is allowed past the "administration" area of the prison—an area that is fundamentally different from the areas where inmates live, eat, sleep, and work.

38.    The ADOC is also highly deceptive about the conditions inside its prisons. ADOC employees often lie outright to a family member who calls with concerns about a prisoner, including lying about the prisoner's medical condition, physical wellbeing, safety, and behavior. On the rare occasions that individuals not associated with the ADOC are granted access to the parts of the prisons where prisoners live (such as by court order during discovery in a civil case), the conditions they observe bear no resemblance to the conditions that exist on a daily basis. Prisoners report that such visits are preceded by day– or week-long "cleanup" efforts, which include scrubbing mold and blood off floors and walls; applying fresh coats of paint; patching or covering up holes in walls and floors; fixing broken windows, telephones, and locks; and ensuring—at least during the visit—that no inmate the visitors see is bleeding, bruised, or high. Prisoners who had been sleeping on a bench, the floor, or outside are temporarily granted access to their rack or cell, and prisoners are often instructed to remain on their racks during these visits and not to talk to or look in the direction of the visitors.

39.    The ADOC's lies about its prisons and prisoners have been exposed innumerable times only because of pictures and videos taken with "contraband" cell phones. Many times, the lives of seriously ill or injured prisoners who were being denied medical treatment have been saved by pictures or videos taken with contraband cell phones and sent to family members, advocates, or the media.

40.    ADOC prisoners who want to show the public the truth about Alabama's prisons have no alternative to using "contraband" cell phones. Some state prison systems provide their prisoners with tablets that allow them to take and send pictures and videos, subject to the same level of monitoring as the prison's phone system. The ADOC, however, does not, leaving ADOC prisoners with no non-prohibited way to share pictures or videos with the public.

41.    In all, the ADOC goes to great lengths to keep the conditions and circumstances inside its prisons secret and to ensure that it controls and approves any information about what happens inside its prisons—including by punishing anyone who dares to challenge its limitations.

### *The ADOC's Attempts to Disrupt FAM's Influence*

42.    The ADOC's efforts to hide the truth about the conditions inside its prisons go far beyond merely prohibiting prisoners from possessing cell phones or punishing those who do.

43.    Since FAM first began organizing shutdowns, the ADOC has gone to great lengths to try to minimize FAM's influence and ability to advocate for prisoners. Many of those efforts have focused on isolating Melvin and Robert Earl—from each other, from other prisoners, from un-incarcerated FAM supporters, and from the world at large.

44.    In January 2014, before the first FAM-organized shutdown had even ended, Robert Earl was taken out of population and placed in segregation. The ADOC kept Robert Earl in segregation for nearly all of the next ten years. Sometimes, his confinement was justified by convicting him of falsified or pretextual disciplinaries. Sometimes, he was given no explanation at all for being sent to or kept in segregation.

45.    Melvin was also sent to segregation in January 2014 because of his association with FAM. He, too, has spent the vast majority of the time since then in segregation, which the ADOC sometimes justified by giving him fabricated, falsified, or pretextual disciplinaries, and sometimes did not even attempt to justify.

46.    Additionally, hoping to dismantle FAM—or at least weaken the organization's ability to organize—the ADOC falsely designated Melvin and Robert Earl as "validated enemies" in 2014. The enemy validation remained in effect until at least January of 2026 and means that the two men may not simultaneously be in population at the same prison.

47.    ADOC employees have also threatened and used physical violence against Plaintiffs in an effort to disrupt FAM's influence, by intimidating Plaintiffs and FAM's un-incarcerated supporters into ceasing their organizing and advocacy efforts.

48.     On January 30, 2021, Robert Earl was struck in the back of the head and beaten viciously by officers at Donaldson after he asked them to stop beating another prisoner. He was airlifted to the University of Alabama Hospital and was unresponsive when he arrived. The beating nearly killed him; he had a cracked skull and broken ribs, and his left eye was severely damaged. His eye requires continued treatment, and he has permanently lost significant vision in it. One of the guards, Cordaro Melton, was criminally charged with First Degree Assault, but he has yet to go to trial. After Robert Earl's hospitalization he was kept in segregation at Kilby for three weeks while being denied his prescribed pain medication. At a subsequent civil trial the jury found that this denial of medical care violated the Eighth Amendment.

49.    In the summer of 2023, while Robert Earl was at Limestone, Lieutenant Jeremy Pelzer placed a "hit" on him, telling several prisoners that he wanted Robert Earl dead and that they would not be punished if they hurt or killed him.

50.    In October 2023, a guard at Limestone sprayed Robert Earl in the face with SABRE Red Phantom Cell Buster pepper spray (an extremely powerful version of pepper spray that is designed to be sprayed into a cell, not onto a prisoner) while taking Robert Earl to segregation. .

51.    In 2014 or 2015, a guard served Melvin oatmeal that had been poisoned. The oatmeal tasted foul, so Melvin ate only a bit. He later found blood in his urine.

52.     In 2015, a gang leader told Melvin that two St. Clair captains had paid the gang leader to place a hit on him.

53.     Melvin Ray was assaulted by officers while his hands were cuffed behind his back. Four officers held him down while a 250-pound officer punched him in the head seven or eight times while his head was pinned on the floor. The aftermath of this incident is portrayed in The Alabama Solution, where Melvin Ray shows his injuries to a camera.

54.     In October 2025, after Raoul complained about Sergeant Roderick Gadson, who was involved in the killing of Steven Davis, a lieutenant at Bullock Correctional Facility called him a "rat" in front of numerous inmates in his assigned dorm.[10] A captain then reassigned Raoul to a more dangerous dorm.

55.     Segregation, which the ADOC euphemistically refers to as the "Restrictive Housing Unit," ("RHU") can be a very dangerous place for a prisoner—especially a prisoner who is disliked by officers.

### *The Dangers of Being in Segregation in Alabama's Prison*

56.     An inmate in segregation in the ADOC is in a locked cell almost all day every day. Inmates are supposed to be taken out of their cells regularly for showers and exercise, as well as for any scheduled medical, mental-health, or administrative appointments. In practice, however, inmates in segregation in the ADOC are lucky to get out of their cells for showers twice a week, and "walks"—outside exercise—are even more rare.

57.     Inmates in segregation rely on other people for nearly everything. Guards—or, more realistically, their inmate-assistants, called "runners"—serve every meal; they deliver every store item and piece of mail; they bring the rolling wall phone to the cell so the inmate can make

---

[10] Being labeled a "rat" puts a prisoner at serious risk of being assaulted by other prisoners.

phone calls; they charge the inmate's tablet; they convey messages to guards; the list goes on and on. As a result, guards and runners have near-complete control over the lives of inmates in segregation.

58.     Relying on someone else for your food is a risky undertaking in Alabama's prisons. Numerous concrete examples—and hundreds of rumors—exist of inmates who were poisoned while in segregation cells and either died or became suddenly and inexplicably ill.

59.     The Alabama Solution recounted the death of James Sales, who ADOC prisoners and staff widely believe was poisoned by guards while he was in a segregation cell. Sales was Steven Davis's cellmate and was in the cell during Davis's beating, which occurred immediately outside the cell: Sales, in short, saw and heard everything. Sales recognized that telling the truth about Gadson's actions would require him to put his own life on the line, and he maintained that the force used by the officers who beat Davis was reasonable. He was scheduled to be released about two-and-a-half years after Davis's murder, and he said he would tell Davis's mother the truth in person, but he could not do anything for her while he was still in prison. Less than one month before Sales's scheduled release, he died in a segregation cell. A runner who gave Sales a cigarette just before his death said that the guards had told him that the cigarette was for Sales and nobody else. The ADOC initially publicly reported that Sales died of "natural" causes; a later autopsy ruled the cause of death "undetermined." The autopsy provides no medical condition that would cause a young man, 29 years old, to suddenly drop dead.

60.     Prisoners in segregation cells at Limestone, Donaldson, St. Clair, and Kilby have all reported fears that their food is being tampered with. Because they fear being poisoned, many inmates simply refuse to eat food from the kitchen when they are in segregation; they rely instead on commissary items, eating only food that is in sealed packaging when they receive it.

61.    The prevalence of fentanyl in Alabama's prisons[11] further compounds the risk: someone whose food, drink, or cigarette is spiked with fentanyl will appear to—and, in fact, will actually—die of a drug overdose, not of some inexplicable reason after potentially exhibiting strange symptoms. And inmates in the ADOC die of drug overdoses after intentionally ingesting drugs so often that nobody is likely to look askance at one more drug-overdose death. Indeed, killing someone by spiking their cigarette, drink, or food with fentanyl is so common in Alabama's prisons that it has a name: a "hot shot." Plaintiffs can each identify multiple examples of inmates who died in segregation from a suspected hot shot.

62.    Segregation can also be especially dangerous because the units generally have less camera surveillance. In the segregation units at some of Alabama's prisons, *no* camera surveillance exists on the block itself—the area where the segregation cells are. Other units have camera surveillance, but there are multiple known blind spots in the coverage. And in all segregation units, the cameras do not cover the shower area or parts of the inside of inmates' cells. The relatively minimal camera coverage means that guards are even more emboldened to assault inmates in segregation. Plaintiffs have each personally witnessed guards beat inmates in segregation without justification countless times.

63.    And because guards control the access an inmate in segregation has to the phone, mail, other inmates, and other prison staff, an inmate who has been beaten by a guard can be hidden in segregation until his injuries heal and there is no objective evidence of his beating.

64.    The DOJ's investigation corroborated this practice: the DOJ "found evidence that following a use of force, officers sometimes place prisoners in segregation for extended periods, so that any injuries can heal unobserved and undocumented."[12]

---

[11] In 2023 there were 1,851 suspected overdoses throughout ADOC.
[12] July 2020 Report at 17.

### *Un-Incarcerated FAM Advocates Call for a Prison Shutdown to Begin on February 8, 2026*

65.     On December 4, 2025, un-incarcerated FAM advocates, including Melvin's sister, held a press conference at the construction site of the new "Governor Kay Ivey Correctional Complex" in Elmore County. The advocates decried the humanitarian crisis within the ADOC, released a list of nine demands, and called for a statewide inmate work strike to begin on February 8, 2026.[13]

66.     On January 4, 2026, Plaintiffs' families and other FAM supporters held a rally outside the ADOC headquarters in Montgomery where they again called for reforms to the ADOC.[14]

### *Plaintiffs' Retaliatory Transfers from Population to a Highly Restrictive Segregation Unit*

67.     As of January 12, 2026, Plaintiffs were each assigned to population dorms at different prisons. Melvin was at Limestone, Robert Earl was at St. Clair, and Raoul was at Bullock.

68.     Early that morning, Robert Earl was told to pack his things because he was being transferred.

69.     Melvin was at trade school when approximately eight guards arrived and escorted him to the back gate.

70.     At the back gates of St. Clair and Limestone, Robert Earl and Melvin each encountered similar circumstances—circumstances neither has ever known to accompany a transfer. Numerous guards were present, as were several K-9 officers with their dogs. Each man

---

[13] Mike Cason, *Alabama prison inmates plan work strike as advocates say 'humanitarian crisis' rages on*, AL.com (Dec. 4, 2025), *available at* https://www.al.com/news/2025/12/alabama-prison-inmates-plan-work-strike-as-advocates-say-humanitarian-crisis-rages-on.html.

[14] *'Free Alabama Movement' protest held at ADOC headquarters*, WSFA 12 News (January 4, 2026), *available at* https://www.wsfa.com/video/2026/01/05/free-alabama-movement-protest-held-adoc-headquarters/.

was placed in a transfer van with darkly tinted windows. The guards in the van had AR-style rifles, which they kept within reach. The transport vans were flanked by escort cars with emergency vehicle lighting, which was on and flashing for Plaintiffs' entire transports. Guided by the front escort car, Plaintiffs' envoys drove through red lights and past stop signs; the vehicles never came to a complete stop until they arrived at the receiving gate of Kilby Correctional Facility.

71.     At the receiving gate, Plaintiffs encountered even more unusual circumstances.

72.     Robert Earl arrived first, getting to Kilby about 2:00 p.m. on January 12, 2026. When he arrived, all three of Kilby's wardens—Defendants Warden Harris and Assistant Wardens Williams and Clemons—were at the receiving gate to meet him, as was every one of Kilby's guards—approximately thirty people in all. The entire prison was locked down, and there was not a single inmate in sight.

73.     Every single item Robert Earl had was taken—all his clothes, hygiene items, legal paperwork, religious material, books, paper, pens, and everything else. He was directed to strip naked, and the clothes he was wearing were taken. He was given two pairs of boxers, two pairs of socks, two t-shirts, one jumpsuit, one jacket, a pair of shower slides, two sheets, a thin blanket, a towel, a washcloth, a bar of soap, a small toothbrush, a travel-size tube of toothpaste, and a roll of toilet paper.

74.     He was then escorted to a small, isolated segregation unit called "L-Block." A sign on the door to the unit said, "Authorized Staff Only." There were five empty cells, and Robert Earl was locked in the cell farthest from the entrance. He was directed to sign some paperwork, but he was not given time to read it, and his request for a copy of it was denied. He was not allowed to make a phone call.

75.     Despite asking repeatedly, he was given no explanation for anything that had occurred.

76.    About three hours later, Melvin's envoy got to Kilby's receiving gate. Melvin was met with the same show of power and force that Robert Earl had encountered—all three wardens and every guard. But Melvin, who keeps his hair in locs and maintains a beard for religious reasons, was subjected to an additional act of intimidation: as soon as he stepped out of the transfer van, Defendant Warden Harris, accompanied by Defendants Assistant Wardens Williams and Clemons, approached Melvin and told him his hair would be cut and his beard would be shaved. Melvin objected, explaining that his hair and beard were expressions of his religion. Ignoring his objections, Defendant Warden Harris directed him to sit in a nearby chair, and a guard cut his hair and shaved his beard.

77.    All of Melvin's property was taken, he was given the same set of items that Robert Earl had been, and he was taken to L-Block. He, too, was directed to sign paperwork that was neither explained nor given to him, and he was denied a phone call or any explanation for his transfer to Kilby or placement in L-Block. He was then locked in the cell closest to the entrance— and farthest from Robert Earl.

78.    Later that evening, Defendants Warden Harris and Assistant Warden Clemons came to L-Block, and Harris spoke to Melvin and Robert Earl. Harris told them they had "been designated to" L-Block, and that she was now in control of every aspect of their entire lives. She instructed them to talk directly to her about any issues they had and told them not to "complain" to anyone else about anything. Before leaving, she said to them, "The stuff you all have going on with FAM and The Alabama Solution, this is our response. This is *our* Alabama Movement."

79.    Raoul arrived from Bullock the next morning, January 13, 2026. He went through a transfer and receiving process nearly identical to Robert Earl's and Melvin's, with one exception: Raoul was allowed to make a phone call before he was locked in his cell—the middle of the five cells with an empty cell between him and each of the other men.

80.     The conditions Plaintiffs are subjected to in L-Block are uniquely restrictive and punishing. A team of twelve guards has been assigned to oversee their confinement. All twelve are either current or former members of the military, and many are members of the Correctional Emergency Response Team ("CERT"). They appear to have been told how to interact with Plaintiffs because they all are universally gruff and disagreeable and convey a constant sense of anger towards Plaintiffs. Two guards and one supervisor are present at a time, in twelve-hour shifts. For approximately their first week in L-Block, Plaintiffs' entire cells were shaken down before every meal. These pre-meal shakedowns continue, but they now occur only randomly. The lights in the block remain on all the time, disrupting Plaintiffs' sleep patterns.

81.     Since their transfer, Plaintiffs have not seen a single other inmate. When Plaintiffs are brought for legal visits, the areas they walk by are either locked down or paper is taped over the windows so that they cannot see or be seen by other prisoners. A small fenced-in area off L-Block is designated for Plaintiffs to exercise, and tarps have been hung on all sides, preventing anyone from seeing in or out. Plaintiffs are not allowed to go to the infirmary; if they need medical treatment, medical staff come to them. The same is true for mental-health interactions—they are only allowed to speak with a mental-health professional from inside their cell with a guard nearby, making confidential communication impossible and preventing them from getting any meaningful mental-health assistance.

82.     All of Plaintiffs' legal and religious materials were taken from them when they first arrived at Kilby, as were all writing utensils and paper. Approximately a week later, Plaintiffs were allowed to access materials from their "active" cases, some of their religious materials were returned to them, and they were allowed to have pens and paper. They have no access to the law library or any other source of legal research. Their requests for envelopes and stamps are denied. They have not been allowed to make any phone calls.

20

83.     On February 2, 2026, Plaintiffs got indications that their food was being tampered with. Familiar with how easily a prisoner in segregation can become seriously ill or die because his food was poisoned, Plaintiffs concluded their only safe option was not to eat. Plaintiffs have not eaten since 6 p.m. February 2, 2026.

84.     Defendants have specifically designed the conditions of Plaintiffs' confinement so that Plaintiffs feel and are extremely isolated. Even when Plaintiffs leave their cells—which they do only to meet with their attorneys or go outside—Defendants have in place systems designed to maintain the sense of isolation. Every aspect of Plaintiffs' transfers to Kilby and their confinement in L-Block was designed to intimidate them—to remind them that they are alone, that they do not control their circumstances or fate, and that they are subject to the whims of an individual—Defendant Warden Harris—they had never met and knew nothing about. Those conditions persist and amplify with every day Plaintiffs remain in solitary confinement in L-Block.

## CAUSES OF ACTION

### COUNT I
**FIRST AMENDMENT RETALIATION**
**For Injunctive Relief**
*All Plaintiffs Against All Defendants in their Official Capacities*

85.     Plaintiffs incorporate by reference Paragraphs 1–84 of this Complaint.

86.     In violation of the First Amendment guarantees of free speech and free association, Defendants Commissioner Hamm, Warden Harris, and Assistant Wardens Williams and Clemons in their official capacities are liable under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), for the ongoing, retaliatory chill to Plaintiffs' First Amendment rights caused by transferring Plaintiffs to "L-Block," a highly restrictive segregation unit in Kilby Correctional Facility.

87.     Defendants in their official capacities each have the authority and means to halt and prevent the challenged retaliation by providing the injunctive relief requested, namely transferring Plaintiffs out of Kilby Correctional Facility and into general population. *See* ¶¶ 7–10.

88.     Plaintiffs engaged in protected speech and association when FAM's un-incarcerated supporters and advocates held a press conference and a rally denouncing the ADOC, calling for an inmate work strike and prison shutdown, and listing FAM's nine demands. *See* ¶¶ 65–66.

89.     Plaintiffs also engaged in protected speech and association through their involvement with The Alabama Solution and its message and viewpoint condemning the humanitarian crisis within the ADOC. *See* ¶¶ 30–34.

90.     In response to Plaintiffs' protected conduct, Defendants retaliated against them by transferring them to Kilby Correctional Facility, isolating them in L-Block, and imposing restrictive conditions on their confinement. Indeed, these conditions are uniquely more restrictive than those imposed on others placed in segregation.

91.     The transfer of Plaintiffs to Kilby Correctional Facility, and the conditions of their confinement therein, are ongoing adverse actions that would chill the protected speech and association of a person of ordinary firmness. *See* ¶¶ 67–84.

92.     Given the ADOC's documented history of failing to prevent guards from using violence against prisoners, including those in solitary confinement, and the incidents of violent retaliation Plaintiffs have personally experienced, the severe and atypical conditions of confinement Defendants imposed upon Plaintiffs by transferring them to Kilby Correctional Facility, placing them in L-Block, and cutting them off from all contact with their family and other prisoners was done to intimidate Plaintiffs and threaten them with assault or poisoning by guards. *See* ¶¶ 13–17, 47–54, 58–64. Such intimidation and threat would further chill the protected speech and association of a person of ordinary firmness.

93.     Injunctive relief is required to protect Plaintiffs from Defendants' ongoing retaliation against them for their association with FAM's un-incarcerated supporters and advocates and The Alabama Solution.

## COUNT II
### FIRST AMENDMENT RETALIATION
### For Money Damages
### *All Plaintiffs Against All Defendants in Their Individual Capacities*

94.     Plaintiffs incorporate by reference Paragraphs 1–84 of this Complaint.

95.     In violation of the First Amendment guarantees of free speech and free association, Defendants Commissioner Hamm, Warden Harris, and Assistant Wardens Williams and Clemons in their individual capacities are liable under 42 U.S.C. § 1983 for retaliating against Plaintiffs by transferring them to L-Block, a highly restrictive segregation unit in Kilby Correctional Facility.

96.     Plaintiffs engaged in protected speech and association when FAM's un-incarcerated supporters and advocates held a press conference and a rally denouncing the ADOC, calling for an inmate work strike and prison shutdown, and listing FAM's nine demands. *See* ¶¶ 65–66.

97.     Plaintiffs also engaged in protected speech and association through their involvement with The Alabama Solution and its message and viewpoint condemning the humanitarian crisis within the ADOC. *See* ¶¶ 30–34.

98.     In response to Plaintiffs' protected conduct, Defendants retaliated against them by transferring them to Kilby Correctional Facility, isolating them in L-Block, and imposing restrictive conditions on their confinement.

99.     The transfer of Plaintiffs to Kilby Correctional Facility, and the conditions of their confinement therein, are adverse actions that would chill the protected speech and association of a person of ordinary firmness. *See* ¶¶ 67–84.

100.    Given the ADOC's documented history of failing to prevent guards from using violence against prisoners, including those in solitary confinement, and the incidents of violent retaliation Plaintiffs have personally experienced, the severe and unique conditions of confinement Defendants imposed upon Plaintiffs by transferring them to Kilby Correctional Facility, placing them in L-Block, and cutting them off from all contact with their family and other prisoners was done to intimidate Plaintiffs and threaten them with assault or poisoning by guards. *See* ¶¶ 13–17, 47–54, 58–64. Such intimidation and threat would further chill the protected speech and association of a person of ordinary firmness.

101.    Defendant Commissioner Hamm is liable for Plaintiffs' transfers to L-Block in Kilby Correctional Facility because, given his job duties, Plaintiffs' notoriety, the extremely unusual manner in which they were transferred, and the highly individualized and uniquely restrictive conditions of Plaintiffs' solitary confinement in L-Block, Defendant Commissioner Hamm was notified of and specifically approved of all circumstances surrounding Plaintiffs' transfers and confinement in L-Block. *See* ¶ 7.

102.    Defendants Warden Harris and Assistant Wardens Williams and Clemons are each liable for personally imposing and directing their subordinates to impose the highly individualized and uniquely restrictive conditions of Plaintiffs' solitary confinement in L-Block.

103.    Defendant Warden Harris is also liable because she specifically stated that she controlled all aspects of the conditions of Plaintiffs' solitary confinement in L-Block.

104.    Defendants Assistant Wardens Williams and Clemons are also liable because they each had the authority and means to ameliorate the uniquely restrictive conditions of Plaintiffs' solitary confinement but failed to do so.

105.    Defendants' retaliation against Plaintiffs as described above reflects malice and a reckless and callous indifference to Plaintiffs' clearly established rights under the First Amendment

to the United States Constitution, rendering Defendants liable for punitive damages under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully seek the following relief:

1.    A temporary restraining order and preliminary and permanent injunctions transferring Plaintiffs out of Kilby Correctional Facility and into general population;

2.    A permanent injunction prohibiting Defendants from subjecting Plaintiffs to punishment or discipline for any actions they may have engaged in before they were transferred to L-Block at Kilby Correctional Facility;

3.    Such compensatory and punitive damages as a jury may award against the Defendants in their individual capacities for their violations of Plaintiffs' rights;

4.    Their costs and attorney fees for pursuing this action; and

5.    Such other, further, and different relief as to which they may be entitled.

Plaintiffs demand a jury trial.

## VERIFICATION OF COMPLAINT

I, attorney Susanne Cordner, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the factual allegations in the above Complaint are true and correct based on a reasonable belief supported by a reasonable investigation into the relevant witnesses and documents.

I am above the age of 18, of sound mind, and competent to make this statement.

Executed on February 5, 2026.

_____

Susanne Cordner

25

Respectfully submitted this 5th day of February 2026.

      /s/ Tiffany Johnson-Cole
Tiffany Johnson-Cole
Law Firm of Robert Simms Thompson, PC
P.O. Box 830780
Tuskegee, AL 36083-0780
334-727-6463
tnjohnsoncole@gmail.com

      /s/ Susanne Cordner
Susanne Cordner
McGuire & Associates, LLC
31 Clayton St
Montgomery, AL 36104-4015
334-517-1000
scordner@mandabusinesslaw.com

      /s/ David Gespass
David Gespass
Gespass & Johnson
40 Echo Lane
Fairhope, AL 36532
205-566-2530
pass.gandjlaw@gmail.com

      /s/ Andrew Menefee
Andrew Menefee
Menefee Law
P.O. Box 6134
Montgomery, AL 36106-0134
amenefee@menefee-law.com

      /s/ Richard Rice
Richard Rice
The Rice Firm, LLC
P.O. Box 453
Birmingham, AL 35201-0453
205-618-8733
rrice@rice-lawfirm.com
Attorneys for Plaintiffs