IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MELVIN RAY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NO. 2:26-cv-00086-BL |
| | ) |
| JOHN HAMM, et al., | ) |
| | ) |
| Defendants. | ) |

# **ORDER**

This matter is before the court on the Plaintiffs' motion for a temporary restraining order and preliminary injunctive relief (doc. 9), which seeks an order prohibiting the Defendants from continuing to confine the Plaintiffs in Kilby Correctional Facility's Restrictive Housing Unit and directing the Defendants to transfer the Plaintiffs back to the general population dorms at the prisons where they were housed prior to their transfer to Kilby Correctional Facility. (Doc. 9-2 at 2 (Proposed Order Granting Plaintiff's Motion for a Temporary Restraining Order)). The Defendants filed a response to the Plaintiffs' motion (doc. 17) and, on February 12, 2026, the court held an evidentiary hearing on the motion. At the court's direction, the Defendants filed a supplemental affidavit containing a timeline of events. (Doc. 21). The Plaintiffs filed a reply brief on February 23, 2026. (Doc. 22).

The Plaintiffs are inmates with the Alabama Department of Corrections. Melvin Ray is incarcerated for a period of life in prison without the possibility of parole for a conviction of murder; Robert Council is incarcerated for a period of life in prison without the possibility of parole for a conviction of murder; and Ricardo Poole is incarcerated for a period of life in prison with the possibility of parole for a conviction of first degree robbery. The Plaintiffs filed this lawsuit on February 5, 2026, seeking money damages and injunctive relief for alleged First Amendment Retaliation. (Doc. 1). The complaint asserts that the Defendants transferred the Plaintiffs to the Restrictive Housing Unit at Kilby Correctional Facility in retaliation for their association with the Free Alabama Movement[1] and for their personal advocacy concerning prison conditions in Alabama. (Doc. 1). The Plaintiffs filed the instant motion for a temporary restraining order and a preliminary

---

[1] According to the Plaintiffs, the Free Alabama Movement ("FAM") is "an organization comprised of incarcerated and un-incarcerated individuals that advocates for the use of nonviolent action to protect the civil and human rights of incarcerated individuals and improve conditions within the ADOC";

> Part of Melvin's and Robert Earl's advocacy involved founding FAM. Founded in 2013, FAM advocates for humane prison conditions, criminal-justice reform, and the end of the forced, unpaid, prisoner-labor on which the ADOC and prisons across the country profit. To further those goals, FAM "has chosen the Non-Violent and Peaceful Protest strategy of 'shutdowns'/[']work stoppages,' with the aim of 'combat[ting] the multi-billion dollar Prison Industrialized Complex.'"

(Doc. 1 at 2, 5).

2

injunction (doc. 9) on February 9, 2026. For the reasons that follow, the Plaintiffs' motion (doc. 9) is due to be **DENIED**.[2]

> "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In order to obtain one, a party must establish four separate requirements—namely, that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted).

*Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020). A preliminary injunction is "'not to be granted unless the movant clearly established the "burden of persuasion" for each prong of the analysis.'" *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014). The Plaintiffs must satisfy their burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*). In this case, the court's analysis can begin and end with the first element. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1329 (11th Cir. 2015) ("Because the plaintiffs have not shown a substantial likelihood of success on the merits, we need not consider the remaining factors in

---

[2] It is undisputed that, on February 9, 2025, Plaintiff Melvin Ray was transferred out of the Restrictive Housing Unit at Kilby Correctional Facility and into general population at Donaldson Correctional Facility. (Doc. 17-3 at 25). Therefore, counsel for the Plaintiffs acknowledged at the February 12 hearing that their request for injunctive relief is moot with respect to inmate Ray.

3

the preliminary injunction test."). Based on the current record before the court,[3] the Plaintiffs have not shown a substantial likelihood of success on the merits of their First Amendment retaliation claim.

As a preliminary matter, the court notes the Defendants' argument that the complaint is due to be dismissed in its entirety because the Plaintiffs failed to exhaust their administrative remedies before filing it (as required by 42 U.S.C. § 1997e(a)). (Doc. 17 at 6). However, that issue need not be decided at the preliminary injunction stage. It is not jurisdictional,[4] and regardless of the outcome of that issue, for the reasons stated below, the court would find that preliminary injunctive relief is not warranted.

---

[3] "When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint . . . are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 2021 WL 2668810, at *1 (M.D. Ala. June 29, 2021) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)). In addition to the factual allegations in the complaint, the court also considered the evidence presented at the February 12 evidentiary hearing and provided by the parties in their supplemental briefing.

[4] The Supreme Court has written:

> [Section] 1997e(c)(2) still serves a useful function by making it clear that the PLRA exhaustion requirement is not jurisdictional, and thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.

*Woodford v. Ngo*, 548 U.S. 81, 101 (2006). In *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020), the Eleventh Circuit held that the district court erred in granting preliminary injunctive relief without first considering the defendants' arguments with respect to PLRA exhaustion. The court reasoned that "the plaintiffs could show a substantial likelihood of success on the merits only if the defendants were unlikely to demonstrate a lack of PLRA exhaustion." 961 F.3d at 1292. Here, in contrast, the PLRA exhaustion issue is not dispositive since injunctive relief is due to be denied for other reasons.

4

To establish a claim for First Amendment retaliation, a plaintiff must show the following: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). The Plaintiffs fail to establish elements one and three.

The Defendants presented evidence at the February 12 hearing that the Plaintiffs were transferred to Kilby Correctional Facility because the Defendants initiated an investigation into the Plaintiffs' planning of a work stoppage and because the transfer would prevent the Plaintiffs from using cell phones or contacting other inmates in furtherance of the work stoppage plan. In light of that evidence, the Plaintiffs are not substantially likely to succeed on their claim that the transfer was retaliatory.

The testimonies of Warden Pamela Harris and Assistant Deputy Commissioner Ted Sexton established the following: In October of 2025, information (including audio telephone recordings) was provided to the Defendants by the regional director of Limestone Correctional Facility suggesting that inmates were planning a work stoppage for February 8, 2026. Specifically, inmates Council and Poole were recorded discussing the work stoppage plan with each other. Inmates

5

Council and Poole were known to the Defendants as having been involved in work stoppages in 2014 and 2023. The information received from the regional director of Limestone facility was corroborated by information gleaned from social media.

Around this time, the Defendants obtained a schedule of dates from inmates at Donaldson Correctional Facility that included a demonstration at the state house, a demonstration at the governor's mansion, and the work stoppage on February 8, 2026. Assistant Deputy Commissioner Sexton called this schedule an "agenda." Over the following months, events described in the agenda took place on the dates stated therein. As those events took place, the Defendants became increasingly concerned that the work stoppage was going to take place as stated in the agenda on February 8, 2026.

The work stoppage was considered a high-profile threat against the safety and security of ADOC's facilities. Transferring the Plaintiffs to Kilby Correctional Facility was viewed by the Defendants and by Deputy Commissioner of Operations Chuck Williams (who ordered the transfer) as the best way to prevent the work stoppage because it would put inmates Poole, Ray, and Council in one place, control their movement and the movement of ADOC staff, and prevent the inmates from obtaining cell phones. All unauthorized contact and possession of contraband could be prevented at Kilby Correctional Facility in a way that it could not be at other facilities.

On January 13, 2026, Council was transferred from St. Clair Correctional Facility to the Restrictive Housing Unit at Kilby Correctional Facility. Ray was transferred from Limestone Correctional Facility on the same day. Poole was transferred from Bullock Correctional Facility to join Council and Ray on January 14, 2026. The inmates' Movement Histories reflect that inmate Council's status was changed on January 13, 2026, to "investigative," and then changed to "preventative," before it was changed back to "investigative" on January 14, 2026; inmate Ray's status was changed on January 13, 2026 to "preventative"; and inmate Poole's status was changed on January 14, 2026, to "preventative." (Doc. 17-3 at 6, 25, 38).

With the foregoing evidence, the Defendants have disputed the Plaintiffs' key allegation, which is that, "[i]n response to Plaintiffs' protected conduct [including their association with FAM and their personal involvement in the Alabama Solution documentary], Defendants retaliated against them by transferring them to Kilby Correctional Facility, isolating them in L-Block, and imposing restrictive conditions on their confinement." (Doc. 1 at 22). Other allegations in the Plaintiffs' complaint support the explanation provided by the Defendants. Specifically, the complaint states that inmates Ray and Council founded FAM and that its chosen strategy is to arrange prison shutdowns and work stoppages. (Doc. 1 at 6). It also states that,

> [o]n December 4, 2025, un-incarcerated FAM advocates, including Melvin's sister, held a press conference at the construction site of the new "Governor Kay Ivey Correctional Complex" in Elmore County. The advocates decried the humanitarian crisis within the ADOC,

7

released a list of nine demands, *and called for a statewide inmate work strike to begin on February 8, 2026.*

(Doc. 1 at 17) (emphasis added). It is true that that the inmates' mere association with FAM, even while FAM publicly called for a work stoppage, was protected activity under the First Amendment that could not form the basis for transferring them to a restrictive housing unit. However, to the extent that the Plaintiffs *themselves* were involved in the planning of the work stoppage, they were not protected by the First Amendment.

ADOC's Administrative Regulation 403 ("Procedures for Inmate Rule Violations") describes "[e]ncouraging or causing others to stop work" as a "high level" rule violation (number 924). (Doc. 17-3 at 71). Rule Violation No. 924 appears to be "reasonably related to legitimate penological interests and therefore [a] valid limitation[] on inmate speech" as it prevents major disruption to the safety and function of the Alabama Department of Corrections. *See Smith*, 532 F.3d at 1277.[5] In the "free world," planning a strike would be protected activity under the

---

[5] *See Council v. Ivey*, 771 F. Supp. 3d 1208, 1234–36 (M.D. Ala. 2025), applying the *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), reasonableness test to ADOC Rule Violation No. 924:

> [C]aselaw on inmate labor union activity and work stoppages suggests that ADOC's prohibitions on the refusal to work and encouraging others to stop working are legitimate. For example, in *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Supreme Court rejected a First Amendment challenge to prison regulations that prohibited meetings of a prisoners' labor union and inmate solicitation of other inmates to join the union. In doing so, the Court held that "[t]he ban on inmate solicitation and group meetings . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration." *Id*. Relying on *Jones*, the Second Circuit has

8

First Amendment; however, in this case, the court must balance the valid penological interests of the Defendants against the Plaintiff-inmates' First Amendment rights.[6]

A claim of retaliation is a question of causation, and the test applied in the "free world" context is a "but for" analysis. *Adams v. James, supra,* 797 F.Supp. at 948. *See: Mount Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("but for" the retaliatory motive, the incidents to which the plaintiff refers would not have taken place). In the prison context at least one Circuit has applied the "but for" standard to inmate claims of

---

held that "[w]ork stoppages are deliberate disruptions of the regular order of the prison environment and are a species of organized union activity" that is "plainly inconsistent with legitimate objectives of prison organization." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009). So "[e]ntreaties to such activity ... are not entitled to First Amendment protection where other less disruptive means of airing grievances are available." *Id.*

. . . .

. . . Plaintiffs do not allege that they were prevented from writing the warden, contacting the media, or filing a lawsuit to discuss their concerns about ADOC forcing them to work for private and public employers.

. . . .

. . . [I]t's likely that work stoppages would affect ADOC's resources, and Rule Violations 924 and 518 do not appear to be an exaggerated response to prison concerns over work stoppages because violations of these rules are punished the same way in which other medium and high-level violations are punished.

[6] In a footnote in their reply brief, the Plaintiffs write that, "[a]rguably, an inmate work stoppage should not be punishable at all, given that the Alabama Constitution bans slavery and involuntary servitude in any form, including as a punishment for a crime. *See* Alabama Const. art. I, § 32 ('That no form of slavery shall exist in this state; and there shall not be any involuntary servitude.')." (Doc. 22 at 4 n.2). In *Stanley v. Ivey*, 2025 WL 3684632 (Ala. Civ. App. Dec. 19, 2025), the Alabama Court of Civil Appeals dismissed claims brought by inmate-Plaintiffs in ADOC asserting that the prison regulations imposing punishment upon them for a failure to work violated article I, § 32 of the Alabama Constitution. The Court of Civil Appeals relied on *United States v. Kozminski*, 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), in which the Supreme Court held that the term "involuntary servitude" in the Thirteenth Amendment "necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." 2025 WL 3684632 at *4.

> retaliation. *See: McDonald v. Hall*, 610 F.2d 16, 18 (1 Cir.1979). The Eleventh Circuit, however, has declined to follow the "but for" analysis in the context of prisoner retaliation suits, "to the extent that the 'but for' test places a greater burden of proof on the inmate." *Adams v. Wainwright*, supra, 875 F.2d at 1537; *Adams v. James*, supra, 797 F.Supp. at 948. Instead, the analysis applied in this Circuit to a prisoner retaliation claim requires a "mutual accommodation" between the penal institution's legitimate needs and goals and the prisoner's retained constitutional rights, under the "reasonableness" test set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

*Thomas v. Pichardo*, No. 08-22333-CIV, 2010 WL 3119623, at *3, n.3 (S.D. Fla. June 2, 2010), *report and recommendation adopted*, No. 08-22333-CIV, 2010 WL 3119544 (S.D. Fla. Aug. 3, 2010).

> "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Prison officials are therefore "accorded latitude in the administration of prison affairs." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). This latitude includes "the withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quotation marks and citation omitted). This means that an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's "status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.*

*Smith*, 532 F.3d at 1277. Under *Turner v. Safley,* 482 U.S. 78, 89–91 (1987), prison regulations can be a reasonable restriction on an inmate's constitutional rights if (1) they are rationally connected to a legitimate governmental interest, (2) there are readily available alternative means for the prisoner to exercise his rights, (3) the prisoner cannot be accommodated without burdening fellow inmates or the prison's

10

resources, and (4) there are no obvious alternatives available to the prison that would accommodate the prisoner's conduct at a *de minimis* cost to legitimate penological interests.

Assistant Deputy Commissioner Sexton testified that the Defendants possessed evidence directly implicating inmates Poole and Council in the planning of a work stoppage.[7] "As the court in *Thaddeus–X[ v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999),] stated, 'if a prisoner violates a legitimate prison regulation, he is not engaged in "protected conduct," and cannot proceed beyond step one.'" *Smith*, 532 F.3d at 1277. Here, the Defendants have not formally issued a citation to the Plaintiffs for Rule Violation No. 924, "encouraging or causing others to stop work," and the Defendants do not claim to have transferred the Plaintiffs to Kilby Correctional Facility as a sanction for that violation. However, the Defendants do claim, and offer evidence to support, that the transfer was made in order to prevent that violation (i.e., to prevent a work stoppage from occurring), which would constitute an action taken in furtherance of the Defendants' legitimate penological

---

[7] At the February 12 hearing, counsel for the Plaintiffs pointed out that the "agenda" obtained by the Defendants came from a cell in Donaldson Correctional Facility, a facility at which none of the Plaintiffs resided at the time. However, Assistant Deputy Commissioner Sexton testified that the Defendants also had audio recordings containing conversations between Poole and Council concerning the work stoppage plans. That evidence directly implicates Poole and Council. The court notes that there was no testimony specifically linking inmate Ray to the work stoppage plan, but that is not an issue at this time as his request for preliminary injunctive relief is moot. The court merely concludes that, on the current record, inmate Ray and inmate Council are not substantially likely to succeed on the merits.

11

interests. A work stoppage would "seriously impede [ADOC's] ability to maintain order and thus achieve the institution's penological objectives." *See Smith*, 532 F.3d at 1279.

Even assuming the Plaintiffs could satisfy the first element of their retaliation claim by showing that their protected activity (their mere association with FAM or their personal advocacy) was a motivating factor in their transfer to Kilby Correctional Facility, they are not likely to establish the third element: causation.

> "[o]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on [his motion for judgment as a matter of law or prior to trial on] summary judgment."

*Id.* at 1278 (alteration in original) (quoting *Thaddeus–X,* 175 F.3d at 399). Even if the Defendants were motivated in part by the Plaintiffs' mere association with FAM or by the inmates' personal advocacy, they have met their burden of production with their evidence showing that they made the transfer based on the Plaintiffs' planning and promoting of a work stoppage in violation of a legitimate regulation. Because of that evidence, the chain of causation between the Plaintiffs' advocacy/association with FAM and their transfer to a Restrictive Housing Unit is broken. *See O'Bryant v. Finch*, 637 F.3d 1207, 1220 (11th Cir. 2011) ("Any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary

12

charges and sanctions) is severed since the harm is not in reaction to any protected activity, but directly due to an improper activity.").[8]

The Plaintiffs' *current* assignment to restrictive housing is a separate matter. Assistant Deputy Commissioner Sexton testified that Poole and Council are assigned to the Restrictive Housing Unit at Kilby Correctional Facility due to separate disciplinary citations unrelated to the work stoppage.[9] (Doc. 17 at 11). According to the Defendants, inmate Ray was transferred out of Kilby Correctional Facility and back into general population on February 9, 2026, because he did not have

---

[8] The Plaintiffs also assert that the conditions to which they are subject at Kilby Correctional Facility are "uniquely more restrictive than those imposed on others placed in segregation" and are "uniquely restrictive and isolating compared to the conditions of confinement typical for L-Block [at Kilby Correctional Facility]." (Doc. 1 at 20–24, doc. 22 at 5). In light of the testimony offered by the Defendants as to the legitimate penological interests served by the Plaintiffs' assignment to Kilby Correctional Facility pending the investigation into the work stoppage (such as controlling their movements and access to contraband), the Plaintiffs are not substantially likely to show that any unique conditions imposed are retaliation for protected activity.

[9] Assistant Deputy Commissioner Sexton also testified that the Defendants' investigation into the work stoppage planned for February 8, 2026, is "ongoing" and that the decision of whether to transfer inmates Poole and Council out of the Restrictive Housing Unit upon the fulfillment of their sanctions would be made by Deputy Commissioner Chuck Williams and would be "based on not only the disciplinaries but the investigative status."  However, the Defendants' ongoing investigation into past conduct cannot serve to justify the Plaintiffs' assignment to a restrictive housing unit indefinitely.  The Defendants began their investigation in October 2025 and to this date have not issued disciplinary citations to the Plaintiffs for Rule Violation No. 924.  The threat of a work stoppage no longer persists.  February 8, 2026, has passed, and as Assistant Deputy Commissioner Sexton testified, ADOC is "returning to normal operations."  (*See* Doc. 17 at 11) ("Once ADOC was sure that a work stoppage would not occur, Ray was transferred to Donaldson. However, Poole and Council remain in RHU at Kilby because of new disciplinary actions for their current behavior, in which each received due process, and there was evidence to support the Hearing Officer's findings.").

disciplinaries and was cooperative during his transfer to Kilby Correctional Facility and during his assignment there. (Doc. 17 at 8–9, 11).

According to the testimony of Warden Harris at the February 12 hearing and the supplemental affidavit filed by the Defendants (doc. 21 at 3–4), on the day of inmate Poole's transfer to Kilby Correctional Facility, he was found with a cell phone. As a result, he received a disciplinary citation for Rule Violation No. 528 – Possession of Phone(s)/Accessory(s). On January 21, 2026, inmate Poole received two more disciplinary citations based on information obtained from his cell phone: Rule Violation No. 529 – Unauthorized Participation in Social Networking and Rule Violation No. 922 – Threat. Inmate Poole had a disciplinary hearing concerning these two violations on February 3, 2026. The corresponding disciplinary reports provided by the Defendants show that inmate Poole received sanctions for those violations including a period of 45 days in segregation. (Docs. 21-1 at 3, 21-3 at 3, and 21-4 at 3).

On January 23, 2026, inmate Council received a disciplinary citation for Rule Violation No. 922—making a threat against Warden Harris at Kilby Correctional Facility. Inmate Council had a disciplinary hearing for that citation on January 28, 2026. The disciplinary report shows that inmate Council received sanctions for that violation including 45 days in segregation. (Doc. 21-6 at 3).

14

According to the Defendants, the reason that inmates Council and Poole remain in restrictive housing is that they are serving the segregation periods with which they were sanctioned as a result of their recent disciplinaries. (Doc. 17 at 5, 11). In light of that explanation, the Plaintiffs are unlikely to show that the current assignment of inmate Poole and inmate Council to a Restrictive Housing Unit is retaliatory. However, by the court's calculation, those sanction periods will end on March 14, 2026 (for inmate Council) and March 20, 2026 (for inmate Poole).

At the hearing on February 12, counsel for the Plaintiffs stated that they contest the veracity of the disciplinary charges they incurred during and after their transfer to Kilby Correctional Facility. Specifically, the Plaintiffs argue that the cell phone did not belong to inmate Poole, that the social media activity for which Poole was charged was six years old, that Council's remark to Warden Harris that was deemed a threat was not in fact a threat, and that the inmates did not receive due process at their disciplinary hearings. (Doc. 22 at 3). Furthermore, the Plaintiffs argued that even if the disciplinaries were valid, they should be permitted to serve their respective periods of segregation in the segregation units at the facilities to which they were assigned before their transfer to Kilby Correctional Facility.

First, the court notes that "[t]he appropriate remedy to review the actions of administrative agencies [like a disciplinary proceeding within ADOC] is an appeal made in accordance with § 41–22–20(a) of the [Alabama Administrative Procedure

Act, Ala. Code 1975, § 41–22–1 et seq.]" *Ex parte Boykins*, 862 So.2d 587, 593 (Ala. 2002). Second, the court notes that even if the disciplinaries are invalid for some reason, it has already found that they were not a pretextual cover-up for a violation of the First Amendment, and the court lacks jurisdiction to intervene and lift the sanctions unless there is a violation of federal law. Although the complaint states generally that the Defendants have charged the Plaintiffs with falsified and pretextual disciplinaries in the past to justify placing them in segregation (doc. 1 at 12), it does not assert a specific claim under federal law that calls into question the validity of the Plaintiffs' disciplinaries aside from the First Amendment claim rejected above.

Because the Plaintiffs have not shown a substantial likelihood of success on the merits of their constitutional claim, the motion for a TRO and a preliminary injunction (doc. 9) is **DENIED**.

**DONE** and **ORDERED** this the 27th day of February, 2026.

_____
**BILL LEWIS**
UNITED STATES DISTRICT JUDGE